B. A. CORBIN & SON CO. v. BROCKTON HEEL CO., Inc.

Circuit Court of Appeals, First Circuit.
March 12, 1928.

No. 2191.

Patents ⊙⟶328—1,553,301, claims 1–3, for improvements in manufacturing heel bases, held void for prior public use.

Albee patent, No. 1,553,301, claims 1, 2, and 3, for improvements in process of manufacturing heel bases, *held* void because of prior public use.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Jr., Judge.

Suit in equity by the B. A. Corbin & Son Company against the Brockton Heel Company, Inc. From a decree of dismissal, plaintiff appeals. Affirmed.

Franklin F. Phillips, of Boston, Mass., for appellant.

Marcus B. May and Herbert A. Baker, both of Boston, Mass., for appellee.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. This is a suit in equity for infringement of letters patent No. 1,553,301, applied for December 7, 1923, issued September 15, 1925, to W. H. Albee, and now owned by the plaintiff.

The patent is for a heel base and the process of making the same. The bill alleges infringement of claims 1 to 6, the process claims, and claim 7, the product claim.

Before trial the plaintiff dismissed the bill as to claim 7, and at the trial relied on claims 1, 2 and 3, but particularly claim 1, which reads as follows:

"That improvement in the process of manufacturing heel bases which consists in securing a U-shaped rand blank to a heel lift, and then skiving the upper face of the assembly so formed to substantially the desired cross-sectional dimensions."

The third claim differs in no respect from the first, except that the U-shaped rand blank is "transversely divided" (two-pieced). Claim 2 differs from claim 1, in that it employs "a transversely divided U-shaped rand blank," and adds an additional step to the process of "subsequently molding and compressing the parts so shaped."

The defenses are: (1) Want of invention, in view of the prior art; (2) that the patentee was not the original and first inventor; and (3) that the process of the claims had been in public use in this country for more than two years prior to the application for the patent.

In the District Court, after a review of the evidence, it was found that the process was in public use before December 7, 1921, more than two years prior to December 7, 1923, the date of the application for the patent. The court expressed the opinion that the contemporaneous documentary evidence, taken in connection with the oral testimony of the witnesses, whom it found were honest witnesses, made out "an unusually strong case of prior public use."

While the court expressed grave doubts as to the patentability of the process, in view of the prior art, and whether the thing described in the patent was a patentable process, it did not pass upon these questions. Having reached the above conclusion, a decree was entered dismissing the bill, and this appeal was taken.

The errors assigned are that the court erred: (1) In holding the patent void because of prior public use; and (2) in dismissing the bill.

The process of claim 1 consists of two steps: (1) Securing a U-shaped rand blank to a heel lift; and (2) then skiving or gouging the upper face of the assembly so formed to substantially the desired cross-sectional dimensions. The second claim makes use of a two-part U-shaped rand and adds the additional step of subsequently molding and compressing the parts so shaped.

In other words, the process of the patent consists in pasting or cementing a two-part U-shaped rand or a unitary U-shaped rand, unbeveled, to a lift, then gouging or skiving the surface of the assembled parts, so as to bevel the rand on the inside and at the same time cut a part of the material from the surface of the lift in its central area and extending to the breast edge of the lift; thus forming a cup or concave surface at the end of the heel which is to be attached to the shoe. The third step called for in the second claim is the molding step, accomplished by inserting a convex mold in the concave surface of the heel base and pressing the parts together.

The product of the process was old. The lift was old. It was old to gouge or skive a lift. A U-shaped rand, whether unitary or in two parts, was old. It was old to bevel the inner edge of a U-shaped rand, whether unitary or in two parts, on a beveling machine, before pasting or tacking it to a lift. It was old to gouge or skive the inner edge of a unitary U-shaped rand on a gouging machine before it was pasted to a lift; but a two-part U-shaped rand could not, before it was pasted to the lift, be gouged or skived; it had to be beveled on a beveling machine. The proof also establishes that it was old to employ a unitary rand of a V-shaped construction; that it was old to gouge or skive such a rand on a gouging machine after it was pasted to a lift; that it could not be gouged or skived on such a machine before that. It also was old, after the cup or concave cavity was formed in the surface of the assembled rand and lift, to mold and compress the parts. The gouging machine was old.

It is the second step—the gouging or skiving of the rand and attached to lift by a single operation on the old gouging machine —that is claimed to be novel. But in view of the evidence submitted in this case we are, as was the District Court, confronted with difficulty in seeing wherein this step disclosed invention. We are, however, convinced that the court below did not err in finding that the process of the patent had been in public use in this country for more than two years prior to the application for the patent. The contemporaneous documentary evidence, the oral testimony, and the physical exhibits disclose beyond any reasonable doubt that the process was in public use more than two years prior to December 7, 1923. The evidence is abundant, and much of it of that contemporaneous documentary and physical character, that does not depend upon the uncertainties of the recollection of the human mind. It is not necessary to comment on all this evidence. We have carefully

examined it, and regard it sufficient to call attention to one physical exhibit, and the circumstances accompanying it, which to our minds indubitably show that the claimed process was in public use more than two years prior to December 7, 1923.

It was admitted by the plaintiff that the Jones Heel Manufacturing Company, of Columbus, Ohio, was practicing the process of the patent as early as June 1, 1922. The evidence was so overwhelming that the process was being practiced by this company as early as June 1, 1922, that counsel evidently thought he conceded little in making the admission. The question remains whether that company was practicing the process at any time before December 7, 1921. The Jones Company was a manufacturer of heel bases in large quantities. The evidence shows that during the summer and fall of 1921 they were selling thousands of pairs of heels to the Excelsior Company, of Portsmouth, Ohio, made according to the process, and that during the same summer and fall they sold to Selz, Schwab & Co. many thousands of pairs of heels made according to the process.

During the preparation of the case the deposition of Mr. Selz, of Selz, Schwab & Co., was taken at his factory. At that time a shoe was produced from the factory and put in evidence by plaintiff's counsel. In interrogating the witness plaintiff's counsel said: "Mr. Selz, I hand you a shoe from which one of your men has just removed the heel, and I ask you to examine that shoe and tell me when it was made? A. 09789, October 19, 1921." This was the number on the shoe and the records of the factory showed that the shoe bearing this number was made October 19, 1921. Thereupon counsel for the respective parties stipulated that the shop records of Selz, Schwab & Co. confirmed the statement of the witness that the shoe was made on or shortly after October 19, 1921. The heel taken from the shoe was then put in evidence by plaintiff's counsel and marked "Plaintiff's Exhibit A."

This action was evidently taken in the belief that the heel disclosed that the rand was tacked to the lift and, if so, indicated that the surface of the rand and heel were not skived or gouged after the rand and lift were assembled; but closer examination afterwards disclosed that the rand was not nailed to the lift, but pasted thereto. The heel also disclosed that the rand was a U-shaped double-pieced rand made of two half rands spliced together at the rear of the heel. Mr. Jones, of the Jones Company, a witness at the trial, after examining the heel, testified that it showed that it was made by pasting on half rands, gouging, and then molding the base; that the heel was one made by him, for the heel base bore the name of his firm "Jones Heel Mfg. Co.," stamped thereon by the heel compressor, which is the last step in the process. He also explained that "as a base goes through a gouging machine there are spurs on the bottom roll that carry it through"; that "these spurs will make impressions on the material that goes through."

A picture put in evidence shows a series of spurs on the bottom roll of a gouging machine. The concave surface of the heel (Exhibit A), which in the process of gouging comes in contact with the spurs of the roll, bears impressions made by the spurs, not only in the center or uncovered lift portion, but on the rand. It is true that these impressions appear more distinctly on the lift portion than on the rand portion, but they nevertheless can be seen on the rand. Why they are less distinct on the rand than on the lift portion is undoubtedly due to the compression of the heel by the compressor, a greater pressure being exerted on the rand portion where the heel is thicker. The compression step is the last one taken in the process of forming the base. While this heel cannot speak, its physical characteristics and indentations speak for themselves, and show that the cup or concave cavity of the heel base was skived or gouged on a gouging machine after the rand was pasted to the lift. The physical markings on the concave surface of this heel, like spots marked on trees to denote the bounds of a grant of wild land, when properly examined and considered in their true relation, carry conviction of the strongest character.

The decree of the District Court is affirmed, with costs to the appellee.